14276

PERRY v. NORTH CAROLINA MUTUAL LIFE INSURANCE CO.

(185 S. E., 47)

April, 1935.

*Mr. N. J. Frederick,* for appellant,

*Messrs. H. W. Adams* and *L. H. Andrews,* for respondent.

April 8, 1936.

The opinion of the Court was delivered by MR. JUSTICE BAKER.

This is an unusual case in that it is an action for the alleged fraudulent breach of a parol collateral contract or agreement regarding the manner of paying and collecting premiums on a policy of insurance issued by appellant, had between an agent for appellant and the beneficiary named in the insurance contract, and brought by the beneficiary for the lapsing or cancellation of the said insurance policy during the lifetime of the insured.

Respondent's complaint in substance alleges that on March 26, 1923, he applied to appellant and there was issued and

delivered to him a policy of insurance insuring the life of his sister in the sum of $146.00, and he was named as the beneficiary; that when the policy was delivered to him it was understood and agreed between him and the appellant, through its agent, that he would pay the premiums monthly instead of weekly as provided in the contract of insurance; that in pursuance of this agreement the agent of appellant called on him and collected monthly the premiums until some time prior to October 29, 1934, when appellant changed its agents, and the new agent refused to accept the premiums by the month and insisted that respondent pay by the week; that the new agent endeavored to induce respondent to take out a new policy of insurance, and to thereby forfeit all benefits accrued and to accrue under the old policy.

Paragraph 5 of respondent's complaint is as follows: "That some time prior to October 29, 1934, while the said policy was in full force and effect, the defendant, its agents and servants, in order to evade and escape its contract obligations and to cause a forfeiture and lapse of the said policy of insurance, and to cause the plaintiff to forfeit all of his rights, benefits and advantages accrued and to accrue thereunder, did in the furtherance of a general scheme or plan designedly put in operation with artifice and cunning to cheat, swindle and rob and defraud this plaintiff of all his rights under his said contract or policy of insurance, and by defendant's acts did cheat, swindle, rob and defraud the plaintiff by failing to call and collect and to accept the said premiums on said policy of insurance in accordance with the promise, assurances and agreements this plaintiff had with the defendant, its agents and servants did thereby cause the said policy of insurance to lapse, although the plaintiff was willing and ready and able to pay the premiums thereon, yet the defendant, its agents and servants, failed and refused to accept the same and did thereby fraudulently cancel and cause the said policy of insurance aforesaid to become lapsed, all of which was flagrant violation of the terms and conditions of the said contract or policy of insur-

ance and the promises, agreements and assurances plaintiff had with the defendant, its agents and servants, as aforesaid, and the defendant did appropriate and convert to its own use all the rights and benefits accrued and to accrue thereunder."

The acts and conduct of the appellant, its agents and servants, were alleged to be willful, wanton, reckless, malicious, unlawful, and fraudulent, in a sixth paragraph, and respondent's resultant damage, $3,000.00.

Appellant's answer admitted formal matters and the issuance of the policy of insurance; denied all other allegations of the complaint except that its agent had insisted on the payment of the premium as provided in the policy, which it alleged contained the whole contract, and further pleaded that under the statute law of South Carolina neither it nor its agent could make any agreement as to such contract of insurance other than was plainly expressed in the policy.

Soon after respondent had commenced his testimony, he being the first witness, the following took place:

"Counsel for Appellant: Now, if the Court please, I should have asked so that there would be no mistake in this matter, the theory under which they are proceeding; whether it is an action for a breach of independent parol contract, or whether they are suing on the policy. I think it is very important that we get that straight so that we will know just exactly in what direction we are going.

"The Court: As I understand that matter, this is an action for breach of a contract made between the plaintiff and the defendant to collect the premiums at his home or office or both. That is the contract which the plaintiff here contends was breached and that such breach was accompanied by an act of fraud.

"Counsel for Appellant: Independent of the insurance contract itself?

"The Court: That is correct."

The taking of testimony was then resumed, and at the conclusion of respondent's testimony, he having furnished

all of the testimony in his behalf, the attorney for appellant moved for a nonsuit upon the following grounds:

"1. That there could be no agreement between the soliciting agent and the beneficiary affecting the policy or contradictory thereto, the same being contrary to Section 7994 of the Code of 1932, Volume 3.

"2. There is only at best an independent parol agreement made by and between the beneficiary and the collecting agent for his convenience.

"3. Such an agreement if made was not and could not be binding on any succeeding agent who would have the right to make any agreement he wanted to, to suit his convenience.

"4. There is no evidence of any fraudulent act, nor of any violation of the alleged agreement made by and between the plaintiff and Porter, the collecting agent."

Upon the refusal of motion for nonsuit, appellant put in its testimony and then moved for a directed verdict on the same grounds as for a nonsuit, and failing in this, for a directed verdict as to punitive damages on additional grounds unnecessary here to relate.

The motions were refused and the jury rendered a verdict in favor of respondent for both actual and punitive damages. Upon motion for a new trial, the trial Judge ordered a new trial *nisi* unless respondent remitted his actual damages to an amount to be figured by the Court, and this the respondent did.

The exceptions of appellant relate to the refusal of the trial Judge to order a nonsuit; refusal to direct a verdict on the whole case; refusal to direct a verdict as to punitive damages; refusal to grant a new trial, and alleged error in charging the doctrine of waiver to the jury.

We will not consider the exceptions seriatim. In passing upon the refusal of the trial Judge to grant the motions for nonsuit and directed verdict, it is proper that we quote some of the testimony and briefly summarize other portions.

Before detailing any of the testimony necessary to decision of this case, we call attention to the fact that the re-

spondent testified that appellant's agents did not undertake to induce him to take out another policy and forfeit his rights under the old policy.

The agent of appellant, who delivered the policy of insurance to respondent, was named Porter. This fact is mentioned in order that the following testimony of respondent, on cross examination, may be more fully appreciated:

"Q. Well, what did he say to you about the policy? A. Well, after he made out the policy and everything he wanted to know how he was going to collect it, and I asked him if it would be all right to collect by the month.

"Q. Now, you know Porter doesn't make out any policies. When he delivered that policy to you that morning, did or not you have a conversation with reference to the policy? A. He didn't deliver it in the morning, it was in the evening.

"Q. Well, did you have any conversation with him? A. No more than the agreement to collect by the month.

"Q. Who started that agreement? A. I asked him if it would be all right to collect by the month.

"Q. Why did you ask him that? A. Because he said himself it was too far for him to walk, just like that, and I said, 'All right, you can collect by the month.' And he said, 'All right.'

"Q. He said it was too far for him to come every week and that instead of doing that he would come every month? A. Yes, sir; that's the agreement we made.

"Q. He didn't ask you, or rather, you didn't ask him to let you pay by the month, but Porter suggested that since it was so far he would come by the month, is that right? A. We agreed together on that.

"Q. I didn't ask you about the agreement, just answer what I asked you. Porter, because you lived so far away, told you that instead of coming every week he would come to you and get it by the month, is that right? A. Yes, sir; that's right.

"Q. You didn't ask Porter to allow you to pay by the month instead of the week, did you? A. I said, 'How about

you doing it that way?' And he said, 'Yes, it will be all right with me.'

"Q. All right, did you ask him to let you pay by the month, or did Porter suggest that he would come by the month? A. He said he would rather come by the month because it was off his debit. He is the one made the agreement.

"Q. And that was because you were so far away he wanted to come by the month? A. Yes, sir.

"Q. You would have paid him anyway; by the week if he had wanted it, is that right? A. It was convenient for me to pay by the month, that's why we made the agreement.

"Q. So it suited you when he told you that it was so far off he would come by the month; that suited you, didn't it? A. It suited both of us.

"Q. I am asking about you? A. He said it suited him and that suited me, and that's why we made the agreement.

"Q. How do you get your pay, weekly or monthly? A. Every two weeks.

"Q. Well, then, wouldn't it have been more convenient for you to pay every two weeks? A. I was working for his convenience.

"Q. You were just obliging him, is that right? A. No, sir; we came to the agreement for both of our convenience.

"Q. Well, wouldn't it have been more convenient for you to pay every two weeks when you drew your money? A. I could get money any time he came there. I could go to the office and get it, but we made the agreement to come and collect by the month because it was off his debit.

"Q. He would come and get the money at the end of every month, Porter would come, is that right? A. At the end of every month; yes, sir.

"Q. And you paid him all that time? A. Yes, sir; every time but once. I missed one time and he collected double the next time."

It is in testimony that the agent, Porter, would on occasions advance the premiums for respondent, and later collect from him. It is undisputed that under the terms of the

policy, the premiums were payable weekly, 10 cents per week. If four weeks' premiums became due and unpaid, the policy would be lapsed. On one occasion when Porter was sick, respondent went to the office of appellant and paid the premiums.

Following the retirement or death of the agent, Porter, the appellant appointed a new agent who called upon respondent for the weekly premium. Respondent testified he refused to pay this new agent because he did not know he was the agent of the appellant, and further on in his testimony said he did not pay him because he had an agreement to pay monthly, and refused to pay weekly. Respondent made no inquiry as to this new agent, nor did he make any payments at the office of appellant. After respondent was informed by this same new agent, the successor to Porter, that his policy was lapsed for nonpayment of premiums, another agent of appellant, known to respondent, undertook to get the policy reinstated, but due to respondent not complying with the requirements of the policy necessary for a reinstatement, it was never revived.

There was testimony from which a jury could have inferred that the policy was wrongfully lapsed and premiums refused thereon wrongfully; that is, that it was lapsed before the premiums were four weeks in arrears, and respondent was entitled to have the appellant accept such premiums as were in arrears without complying with the requirements of the policy as to reinstatement as for a lapsed policy, especially when there was testimony that the agent had not called regularly for the weekly premiums after respondent had refused to pay the agent who succeeded Porter on the first occasion on the ground that he did not know if he was a *bona fide* agent of appellant. However, it must be borne in mind that this action is based on the fraudulent breach of the parol contract, and not of the insurance policy contract.

It will be seen that there was really no new or collateral contract, but that the alleged parol contract was a purely personal arrangement between the old agent of appellant, Por-

ter, and respondent. At most, the alleged contract is not of the character which the parties contemplated should be communicated to the company, nor was there anything in the contract itself or in the discussions between the parties relating to it requiring it to be brought to the attention of the company. This absence of knowledge on the part of the company would seem to prevent the assertion of any contractual liability against it.

The issuance and delivery of the insurance policy and the alleged verbal agreement were apparently contemporaneous transactions. Thus we have a written contract which one of the parties seeks to vary by setting up a parol agreement alleged to have been made in the course of the negotiation of the written contract. The written contract, however, merges all of the negotiations, calling into play, in its most elementary form, the salutary principle that a written contract cannot be varied by parol evidence of verbal provisions which were left out of the contract, in the absence of any showing of fraud, mutual mistake, etc.

The alleged verbal agreement is an attempt to make an agreement collateral to the contract expressed in the policy, so that according to the plaintiff's contention the contract in this case would consist of two things, to wit, the written policy and the agreement between the respondent and the agent of the insurer. This presents a situation in direct violation of that provision of Section 7994, Vol. 3, Code of 1932, which prohibits the making of any "agreement as to such contract" (of insurance), other than as expressed in the terms of the policy. The language of this section seems specifically to prohibit the making of supplementary agreements relating to an insurance policy at the time of the issuance of the policy.

There is no waiver or estoppel here. Nothing that the agent did prevented the respondent from making his payments direct to the company or to an agent of the company, nor did the alleged agreement lull the insured

into any sense of security against any attempt of the insurer to forfeit the policy. In other words, the respondent knew that he was to pay a certain amount per week and that the appellant expected him to pay that amount to its agent. He also knew that the arrangements between himself and the agent were purely personal, and for the convenience of both. This is evidenced by the fact that when the agent, Porter, was sick on one occasion and could not call for the premiums, respondent went to the office of appellant and paid the premiums, thus complying with the terms of the policy to continue it in force.

After an agreement has been consummated, literal compliance with its terms may sometimes be avoided by parol evidence of waiver, resting on the doctrine of estoppel. But where the question, as here, is not whether the insurer waived compliance with its contract after the contract was consummated, but whether the contract is wholly expressed in the policy, or only partly in the policy and partly in an alleged contemporaneous agreement, no question of waiver is presented. The sole question is: What was the contract? And the answer must be found in the written instrument.

Reversed, and remanded to the Richland County Court for entry of judgment for appellant in accordance with Rule 27.

Mr. Chief Justice Stabler and Messrs. Justices Carter, Bonham and Fishburne concur.